In re T███ F█████ – D.O.B. ████-96
Hearing Officer Charles R. Jones Esq.

## MEMORANDUM IN SUPPORT OF PARENT'S REQUEST FOR COMPENSATORY EDUCATION FOR T██████ F███████

### INTRODUCTION

Angelique Moore, on behalf of her daughter T████ F██████, respectfully moves for an award of compensatory education as relief for the denial by DCPS to T████ F██████ of a free appropriate public education. As explained in more detail below Ms. Moore contends that T██████ was denied a free appropriate public education by DCPS from January 2003 until July 14, 2005 when T██████ began school at Accotink Academy. Ms. Moore contends further that as a result of DCPS' failure to provide FAPE T██████ was at the same kindergarten level when tested in April 2005 as she was when tested by DCPS in October 2002, that T██████ needed a full time language based special education program since tested in October 2002, and that if T██████ been provided an appropriate IEP and placement and had they been fully implemented she would have progressed academically to approximately the beginning second grade level by April 2005 when last tested and made additional progress thereafter.

To fill the gap between where T█████ is and would likely have been Ms. Moore seeks an award of compensatory education. As discussed in detail below compensatory education is supplementary to ongoing FAPE and is a "replacement of educational services the child should have received in the first place." *Reid v. District of Columbia,* 401 F.3d 516, 518 (D.C. Cir. 2005). Ms. Moore seeks compensatory education in the form of intensive tutoring, supplementary speech language services, annual testing paid for by DCPS by evaluators of parent's choice, and such other relief as may be appropriate and just to "elevate [T██████] to the position [she] would have occupied absent the school district's failures." *Id.,* 401 F.3d at 527.

The period for which compensation is sought is January 1, 2003 through July 14, 2005. During this period DCPS developed three inappropriate IEPs, placed T██████ in three inappropriate classes, failed to fully implement the IEPs, and totally failed to provide a free appropriate public education to T██████ F███████. The denial of FAPE ended when T██████ enrolled at Accotink Academy on July 14, 2005 pursuant to the Hearing Officer's Determination dated May 24, 2005.

The HOD in this matter followed a May 11, 2005 hearing. On that date due to time constraints the question of compensatory education was not litigated. After a Motion for Reconsideration by parent the Hearing Officer ordered that the compensatory education issue would be resolved by Memorandum and supporting evidence. Order, November 16, 2005. The Hearing Officer also ordered parent to brief the standard set out in *Reid v. District of Columbia, supra.*

### COMPENSATORY EDUCATION AND THE REID STANDARD

As noted above compensatory education is "replacement of educational services the child should have received in the first place." *Reid, supra* at 518. It is a form of "appropriate" relief, 20 U.S.C. § 1415(i)(2)(C), that courts and hearing officers may fashion "when a school district deprives a disabled child of free appropriate public education in violation of the" IDEA. *Id.* It allows "courts and hearing officers [to] award 'educational services ... prospectively to compensate for a past deficient program." *Id.*, 401 F.3d at 522 *quoting G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308 (4th Cir. 2003).

It is important to emphasize that compensatory education is a supplement to any ongoing free appropriate education to which a child is entitled: "whereas ordinary IEPs need only provide 'some benefit,' compensatory awards must do more—they must *compensate.*" *Reid, supra*, 410 F.3d at 525. As such it is improper to assume that a child's current placement is compensatory and in fact the opposite should be assumed. *Id.* In this case, because T█████ has recently been placed at Accotink in order to provide her FAPE for the current school year, May 24, 2005 HOD at 8, ¶ 3, compensatory education must supplement whatever is being provided at Accotink.

In *Reid* the Court explained that compensatory education is an equitable remedy and that the essence of equitable jurisdiction is " 'to... mould each decree to the necessities of the particular case." *Id. quoting Hecht v. Bowles*, 321 U.S. 321, 329 (1944). In the IDEA context "appropriate" relief is relief designed to " 'ensure that the student is appropriately educated within the meaning of the IDEA." *Id.* (citation omitted.) Under this "flexible approach" relief will vary from case to case "depending on the child's needs" with some children requiring only "short, intensive ... programs targeted at specific problems or deficiencies" and others needing "extended programs, perhaps even exceeding hour-for-hour replacement of time spent with FAPE." *Reid supra* at 524:

> In every case, however, the inquiry must be fact-specific and, to accomplish IDEA's purposes, the ultimate award must be reasonably calculated to provide the educational benefits that <u>likely would have accrued</u> from special education services the school district should have supplied in the first place.

*Id.* (emphasis added.)

Once it is determined what "benefits likely would have accrued" it is necessary to determine how to provide those benefits belatedly – to formulate an award that reasonably can be expected to provide T█████ the educational benefit she would probably have received if FAPE was supplied in the first instance. *Reid* teaches that to do this the parties must "present evidence regarding ... the specific compensatory measures needed to <u>best correct those deficits</u>." *Id.*, 401 F.3d at 526 (emphasis added.)[1] Based on evidence presented a court or hearing officer must make "an informed and

---

[1] Thus, while a child seeking an appropriate education is only entitled to a "basic level of educational opportunity" and not to the best program his parents can devise, *Board of Education of the Hendrick Hudson C.S.D v. Rowley*, 458 U.S. 176, 192 – 198 (1982), once the basic level has been denied the child <u>is</u> entitled to the <u>best program</u> available to fill the gap.

In re T█████ F█████
Memorandum in Support of Compensatory Education
Page 2 of 12

reasonable" determination "regarding what services [a child] needs  to elevate him to the position he would have occupied absent the school district's failures." *Id.*, at 527 (emphasis added.)

In short *Reid* requires that we first ascertain where T██████ would have been but for the denial of FAPE and then to devise compensation that will allow T██████ to reach that point in the future. This cannot be done by providing FAPE going forward but providing something supplementary to FAPE that is best designed to fill the gap. While T██████ will make gains from the FAPE now being provided and would, with that program alone, eventually fill the gap, *Reid* does not allow FAPE to be used to fill the gap.[2] Rather the Court made clear that a program providing FAPE "carries no guarantee of undoing damage done by prior violations." *Id.*, 401 F.3d at 523. Indeed, by definition FAPE is only a program designed to provide a "basic level of educational opportunity."

The compensatory plan cannot be derived by using a "cookie cutter" approach but instead must be based on all the circumstances unique to T██████ F██████ case and based on what expert witnesses state is needed and likely to produce the desired result. The attached declarations of Dr. Meredith Branson and Dr. Sheila Iseman contain that evidence.

## III. BACKGROUND

In this matter the hearing officer has already determined that T██████ F██████ was denied a free appropriate public education for school year 2004-2005. More specifically based on testimony from Dr. Meredith Branson, at the hearing and in a post-hearing memorandum requested by the Hearing Officer,[3] the Hearing Officer concluded that "T██████ appropriate disability classification is learning disabled."[4] *See* FF 15, 18, 19, 20, 21, 22, 23, 24; Conclusion of Law, HOD at 7. The Hearing Officer also determined that DCPS failed to provide an appropriate IEP and failed to provide an appropriate educational placement" for T██████. Conclusion of Law, HOD at 7-8. The Hearing Officer concluded further:

> The record is replete with the fact that T██████ had not achieve[d] any academic benefit from her placement at Stanton ES due, in substantial part, to the inappropriate IEP, which DCPS failed to implement. Under this set of circumstances, DCPS has denied this student a free appropriate public education.

---

[2] For example, if T██████ is now at a kindergarten level and should be at beginning second grade, and if she can make 6 months progress for every 12 months of appropriate schooling, she can be expected to fill a 24 month gap in 48 months. From today that would mean T██████ would be at the 2d grade level in December 2009. But since she would, but for the denial of FAPE, be at a 4th grade level by 2009, the gap cannot be said to have been filled by the FAPE thus provided.

[3] Memorandum to Hearing Officer Jones, May 12, 2005.

[4] The June 14, 2004 IEP classified T██████ as MR, HOD FF 2 citing TF-11.

HOD at 8.  While the May 2005 HOD delegated the compensatory education decision to
the IEP team, HOD at 8, ¶ 6, that part of the decision was vacated when parent's Motion
for Reconsideration was granted.  HOD October 31, 2005, November 21, 2005.[5]

## IV.  EVIDENCE AND ARGUMENT

Because the initial hearing in this matter addressed only the 2004-2005 IEP,
testimony was not taken regarding the January 2003 IEP or January 2004 IEP.   The
Declaration of Dr. Meredith Branson, attached hereto as F██████Exhibit 23, Declaration
of Dr. Sheila Iseman, Ex. 24, along with documents already in the record, proves that
those IEPs were also inappropriate, that T████ made no progress under those IEPs and
was accordingly denied FAPE for the period covered by those IEPs.  The declarations
also make clear that as a result of this denial of FAPE T█████ is roughly two years
behind where she would have been but for the denial, that T████ has the cognitive
ability to catch up but that intensive compensatory services are needed to help her catch
up.

A.  T█████ is approximately two years behind where she would have been but for
the denial of FAPE

### (1) The Three DCPS IEPS Were Essentially Identical and Not Appropriate

At the outset it is important to note that the January 2003 IEP and January 2004
IEP, F██████Exhibits 8, 9 are nearly identical to each other and, largely identical to the
June 2004 IEP already found to be inappropriate.  F██████Ex. 11. *See also* Ex. 22
(5/12/05 Branson Memorandum); Ex. 23, ¶ 27; Ex. 24, ¶ 10.  One difference is that the
two earlier IEPs both classify T████ F██████ as Learning Disabled whereas the later
IEP incorrectly classified T████ as MR.  This seems ironic because the earlier IEPs
were based on lower IQ scores than the later IEP.[6]  The two earlier IEPs relied on
October 2002 WISC III scores as follows:  PIQ 62; VIQ 56; FSIQ 55.[7]   The June 2004
IEP lists IQ test results as follows:  PIQ 75; VIQ 67; FSIQ 68.

Second, the January 2003 and January 2004 IEP list identical present educational
performance levels.[8]  There is no indication of any progress by T████ in the intervening
year.

Third, six reading objectives listed on the January 2003 IEP are repeated on the
January 2004 IEP: 1) "recognize and produce consonant letter sounds at the beginning
and ending of words (fourth objective on 1/03 IEP; first objective on 1/04 IEP); 2)

---

[5]  Although the orders do not expressly so state parent understands this to be the case in light of the
arguments in her motion based on the *Reid* court's determination that IEP teams are not to make
compensatory education decisions.  401 F.3d at 526-527.
[6]  The January 2003 team apparently determined that T████ was not MR, however, because of "strengths
noted in written skills and coping skills" on the Vineland.  Ex. 8, MDT notes page 3.
[7]  This is clear from the January 2003 MDT meeting notes attached as part of F██████ Exhibit 11.  While
the IEPs state that these results are from January 27, 2003, that was the date of the IEP meeting.  The notes
show that the numbers presented on page 2 of the IEP are scores from October 25, 2002 testing by T. Erby.
[8]  *Compare* 2003 IEP page 2 of 4 with 2004 IEP page 2 of 4.

"recognize and produce long and short vowel sounds (1/03 fifth objective; 1/04 second objective); 3) "learn five site words from the Dolch preprimer list (1/03 sixth objective; 1/04 third objective; 4) "student will write letters of the alphabet on command (1/03 third objective; 1/04 fourth objective; 5) "student will answer comprehensive questions orally in class (1/03 ninth objective; 1/04 fifth objective.");[9] 6) "orally summarize stories read aloud by the teacher (1/03 tenth objective; 1/04 sixth objective.) That these six objectives had to be repeated shows clearly that they were not mastered, that is, that no benefit was obtained, under the 2003 IEP. *See* F▮▮▮ Ex. 22, Branson Memorandum; Ex. 24, ¶ 27 Branson Declaration; Ex. 24, ¶ 20 Iseman.

Indeed, the same six objectives were also repeated on the June 2004 IEP, F▮▮▮ Ex. 11 already found inappropriate by the Hearing Officer in this matter. HOD at 8. If progress had been made these objectives would not have had to have been repeated. Since these objectives were listed in January 2003, January 2004 and June 2004 it is clear that as late as June 2004 they had not been mastered. Since the Hearing Officer has found that no benefit was gained by T▮▮▮ under the third of these IEPs, that is, from June 2004 through the hearing date, it is clear that no benefit was gained, during the entire period January 2003 through May 2005 when the hearing was held. There is no reason to believe any progress was made at anytime before T▮▮▮ matriculated at Accotink in July 2005.

Fourth, four math objectives listed on the January 2003 IEP are repeated on the January 2004 IEP and June 2004 IEP: 1) understand the concept of addition and subtraction (first objective on each IEP); complete one step addition and subtraction problems (1/03 second objective; 1/04, 6/04 third objective); 3) count rote to 50 (1/03 third objective; 1/04, 6/04 second objective); 4) tell time to the whole hour (1/03 fifth objective; 1/04, 6/04 fourth objective). In addition, the 2003 objective of recognizing and writing numbers 1-10 (fourth objective) was expanded to 1-50 as the fifth objective in January 2004 and June 2004. Taken together it is clear that T▮▮▮ garnered no benefit from any of these math objectives from January 2003 through the date of the HOD in May 2005.

Fifth, the June 2004 communication goal/objective page copies the January 2004 communication goal/objectives page. This shows that no benefit was obtained in the intervening 6 months. Moreover, the speech language pathologist at the January 2004 IEP meeting opined: "T▮▮▮ progress in language therapy has been minimal." F▮▮▮ Ex. 9, MDT notes. Because the Hearing Officer found no benefit under the June 2004 IEP, the lack of benefit from speech language therapy from January 2003 through the date of the HOD is clear.

The January 2003 IEP called for only 30 minutes per week of speech language therapy to address one goal – improving "expressive/receptive language skills." This minimal level of language therapy was "inadequate … for a student whose needs are so

---

[9] In 2003 the word "comprehensive" is used while in 2004 the word "comprehension" is used. The former would appear to be a typographical error as it is inconceivable that T▮▮▮ could answer comprehensive questions even if she could answer comprehension questions.

severe," Ex. 24 ¶ 19 (Iseman), a severity recognized in DCPS' meeting notes which described T███ as being "significantly below norm" in spoken language.

Moreover, even though the speech language therapist at the January 2004 IEP meeting noted T████ "minimal" progress under the prior IEP, the team only increased her therapy to one hour per week from 30 minutes per week.

Because the January 2004 IEP contained essentially the same goals/objectives and services as its predecessor it is clear that T████ derived no benefit in the intervening year. Similarly, because the June 2004 IEP essentially copied the January 2004 IEP, it is clear that T████ derived no benefit from the January 2004 IEP. FAPE was denied, therefore, for this entire 18 month period plus the period of the June 2004 IEP already found inappropriate by the hearing officer. Further, while DCPS developed an ESY IEP for summer 2004 in March 2004 it contains only some of the same objectives listed in the June 2004 IEP already found inappropriate. Compare F████ Exhibits 10, 11. All tolled T████ was denied FAPE from January 2003 until she started at Accotink in July 2005, a period of over 30 months.

The IEPs were also not appropriate for numerous other reasons. For example, while psycho-educational testing included a VMI score of 55 (*see* 2003 meeting notes) indicating "clear deficits," Ex. 24, ¶ 19 (Iseman) the 2003 IEP contained no occupational therapy goals and objectives or therapy. *Id.* Nor did the IEP contain written expression goals/objectives despite testing showing that area of weakness. *Id.* Further, the reading goals/objectives "do not reflect a sensible, sequential plan for acquiring skills for decoding and comprehension" and "provide insufficient expectations for progress." *Id.* For example, the IEP only expects T████ to learn five sight words in a year when she could be expected to learn 100. *Id.* In addition math goals/objectives are inadequate and needed goals/objectives pertaining to executive functioning are inexplicably omitted. *Id.*

The January 2004 IEP was, if anything, less appropriate. Even as DCPS essentially copied the 2003 IEP they failed to increase the amount of special education, leaving it at 15 hours per week. The only service increased was speech language therapy and that only from 30 to 60 minutes per week. Ex. 24, ¶ 20 (Iseman). While the communication goals/objectives changed, they continued to be inappropriate because they "did not address receptive language or the organization of langue" despite needs in those areas. *Id.* Not surprisingly T████ made no progress in these areas, as evinced by the June 2004 Vineland score of 42 "showing a student totally unprepared to interact with others using language." *Id.*

## 2. T████ Needed Full Time Special Education in a Language Based Environment

In her Declaration Dr. Branson states that T████ needs and has needed "a full time, self-contained, language-based educational program in a classroom with a student:teacher ratio no greater than 5:1" as well as "individual and group therapy to address her weaknesses in oral expression and listening year round language based special program since at least January 2003. Ex. 23 ¶ 23. Indeed, T████ third grade teacher also believed that T████ needed a full time program. Ex. 24, ¶ 7 (Iseman). Not

only was the program not full time but it was apparently provided in the back of another classroom where distractions for T██████, who has ADHD, abounded. *Id.* ¶ 6.

Dr. Branson explains that given the October 2002 test results "T███████ reading goals/objectives should have been to provide her with specific pre-reading skills, using a research-based phonological awareness training program." *Id.* Dr. Branson explains in detail what she means by all of this. ¶¶ 23, 24. Dr. Branson explains further that "the reason a language-based program was needed for T██████ was her primary diagnosis is that of a student with a significant language-bassed learning disability" and that "this disability … makes it impossible for T██████ to learn language like typically developing young readers." *Id.* ¶ 25.

Moreover, because of her language disability it is not just reading that must be taught in a language based environment but all subjects throughout the day. *Id.* ¶ 24.

**3. But for the Denial of FAPE T██████ Would Likely Be Performing at a Higher Academic Level**

While "students with learning disability typically progress at a slower pace than their typical peers" given her non-verbal strengths T██████ "still should have made progress if given an appropriate program" during the years in question. Ex. 24, ¶ 21. "While it is unlikely that she would have made a year's progress in a year's time, it is reasonable to expect that with the appropriate intervention she would have made at least half the progress of her peers." *Id. See also* Ex. 23, ¶¶ 26, 28, 30 (Branson). Had that been done when tested by Dr. Branson in April 2005, instead of testing at the kindergarten level, it is likely that she would have tested at the end of first or beginning of second grade level. Branson, ¶ 26. Because T██████ was not properly programmed "in April 2005 her levels of performance were identical to her levels as measured in October 2002, 30 months earlier." *Id.* ¶ 27 (Iseman)

Therefore, if T██████ had had an appropriate program that was fully implemented from January 2003 through mid-July 2005, when T██████ started at Accotink, she would likely have progressed from the beginning Kindergarten to about the beginning second grade level.

Instead, because an appropriate program was not provided to T██████, she made no progress. Thus, when tested by Dr. Branson in April 2005 T██████ was functioning at the same beginning Kindergarten level in most areas (first grade in one area) at which she was functioning when tested by DCPS in October 2002. In thirty months between evaluations T██████ languished, making no progress.

Moreover, Dr. Branson points out that this loss of time was crucial because established research has shown that children learn most easily when they are younger and that it takes longer to learn as they age. Declaration ¶ 37. Iseman, ¶ 23.

Put another way now ten year old T██████ F██████ is functioning at the level of a five or six year old child. While she would not be functioning like a ten year old if properly programmed she would be functioning like a 7 or 8 year old. Because the

reason for this deficit is DCPS' failure to provide FAPE and because the evidence shows that T██████ would likely be functioning at the higher level but for this denial of FAPE, it is appropriate to provide such relief as is appropriate to fill the gap thus created – to "provide the services needed to elevate her to the position she would have occupied absent the school district's failures." *Reid, supra* at 527.

## V.  What Compensatory Education is Appropriate for T██████ F████████?

One problem in a case such as this one is that the child so deprived continues to need full time special education.  In such a case that which supplements, that compensates, is not easy to identify or find time to supply.  It is impossible to provide the full time program T██████ has needed for the last two years so long as she is receiving a full time program.

Another problem is the problem of measurement.  Both Dr. Branson and Dr. Iseman make clear that T██████ is likely to be six months farther on academically a year from now than she is today if she continues in her current program.  For example, if T██████ is still at the beginning kindergarten level now she is likely to be at K:6 in December 2006.  But this does not make up the gap created by DCPS' nonfeasance or misfeasance because T██████ should be at Grade 2:6 to 3 by that December 2006.

How then to fill some of the gap between where T██████ is and where she should be?

Dr. Branson has stated her opinion that the way to do this is by providing as much tutoring and added speech language programs as can fit into T██████ day after school and on weekends. Ex. 23 ¶¶ 40-43.  Dr. Iseman agrees. Ex. 24, ¶¶ 24, 25.  In Dr. Branson's opinion if this is done it is reasonable to conclude that by the time T██████ is 18 she will have filled the gap.  Declaration ¶ 43.  In other words, with massive amounts of tutoring Dr. Branson believes that it is likely that by 2013 or 2014 T██████ should be at the same level she would have been but for the denial of FAPE by DCPS, that the roughly two year gap so created can thus be closed.

This is of course not an exact science.  There is no way to know every variable that will come into play in the future.  T██████ might progress more quickly or less.  If annual testing shows that the gap is closed sooner DCPS' compensatory education obligation would end.  Similarly, if testing shows that the gap has not been closed by 2013 the obligation would continue.

*Reid* does not require exactitude.  Rather the Court said only that parent must prove where it is likely T██████ would have been but for the denial of FAPE and provide evidence to justify an award "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid supra* at 524.

In her Declaration Dr. Branson notes that one way to close the gap would be to tack on two additional years of full time education of the type she has testified is necessary now after T██████ ages out. Ex. 23, ¶ 42.  If that were done T██████ would

continue to progress but the gap would not be filled for 10 or more years. In Dr. Branson's opinion this is not the best way to proceed. *Id.*

Instead, Dr. Branson has opined that "the best way to compensate T████ is to provide intensive services now on top of what she is getting at Accotink:

Such services should be in the form of massive amounts of academic tutoring, speech language therapy (on top of what she gets at Accotink), and other services that her mother and Accotink team determine will help her learn more quickly, that is to make more than 6 months progress in every 12.

*Id.* Dr. Branson continues:

Individualized services are needed because of T████ attention problems and language disability and to allow the teacher/therapist to focus intensively on areas of immediate need as they are identified by T████ school-based teachers and therapists. Research has clearly shown that the more intensive the education the quicker children with disabilities like T████ are able to learn. The sooner these intensive services are provided the more T████ can benefit from them. Proceeding in this manner will have a compounding effect because everything she learns now will help her learn more as she goes along. Doing all of this on a one on one basis will concentrate her learning, allow for immediate feed back, and allow for revising tutoring strategies and subject matter in a way that is likely to allow T████ to progress faster and thereby fill the gap left by the past failure to provide an appropriate education.

Finally, the tutoring and other services must be provided until the gap is closed. The only way to determine when the gap is closed is to formally test T████. So as to compare apples and apples the same tests used by Dr. Branson should be used in the future. Testing should be done initially in April 2006, the anniversary date of Dr. Branson's testing. To ensure that the tests are done properly they should be performed by Dr. Branson or someone else designated by Ms. Moore but these should be paid for by DCPS.

So as to avoid confusion parent requests that the Hearing Officer order DCPS to specify the procedure that is to be used to facilitate all payments, for tutoring, speech language, and other services, including testing, by way of a letter to undersigned counsel not later than 10 days after the HOD. Failing such specification payments should be made pursuant to a system that undersigned counsel will designate by supplement to the record and copy to DCPS counsel.

*Reid* makes clear that compensatory education is an equitable remedy. One of the most basic tenets of equity is the "clean hands" doctrine. In this case DCPS does not come before this forum with clean hands. As the Hearing Officer said in the May 2005 HOD "the record is replete with the fact that T████ had not achieve[d] any academic benefit from her placement at Stanton ES due, substantial part, to the inappropriate IEP, which DCPS failed to implement." HOD at 8.

The additional record developed here is equally replete with evidence of failures by DCPS. And these failures go back to at least 2002. As both of parent's experts attest at that time an appropriate evaluation would have included non-verbal testing such as the C-TONI. Ex. 23, ¶ -- Ex. 24, ¶11  Dr. Iseman also tested that based on test results and other knowledge about T█████ DCPS should have obtained occupational therapy, ADHD, and executive functioning testing to determine T███████ unique needs. Ex. 24, ¶ 20.  Such testing is required under federal rules requiring DCPS to perform "full and individual evaluations," 34 C.F.R. § 300.320 and to ensure that "tests are selected and administered so as to best ensure that if a test is administered to a child with impaired sensory, manual, or speaking skills, the test results accurately reflect the child's aptitude or achievement…." 34 C.F.R. § 300.532(e); 5 DCMR § 3005.9.

Because appropriate testing was never done DCPS never obtained an accurate picture of T██████ needs. They then proceeded to develop IEPs each of which was more inappropriate than the last. Indeed, DCPS essentially copied one IEP over and over, implicitly recognizing that no progress had been made but never changing a thing, including the level of service provided. Even as T██████ behavior, which initially was not a problem, Ex. 8, (meeting notes) deteriorated, DCPS failed to investigate the causes, provide counseling or a behavior plan.

Not only were the IEPs inappropriate but, as the evidence at the hearing showed, they were not fully implemented. Nor were they implemented in appropriate settings.

From October 2002 until July 2005 T█████ F██████ languished under the not very watchful eyes of DCPS' teachers and therapists. During that time she made no progress academically and developed emotional problems as a result of her continuing failure. DCPS does not come to this proceeding with clean hands.

The evidence shows clearly that as a result of DCPS' misfeasance and non-feasance T█████ F███████ made no progress in 33 month period when she should have made sixteen to seventeen months progress. The evidence also shows that to make up this achievement gap, to bring T██████ "to the position [s]he would have occupied absent the school district's failures," *Reid supra* at 527, she needs massive amounts of individualized tutoring, speech language therapy and other services, on top of what she is getting at Accotink. In the experts' opinions these are "the specific compensatory measures needed to best correct" T██████ deficits. *Id.* at 526.

Accordingly, parent respectfully requests that compensatory education be ordered as follows:

1) DCPS shall pay for tutoring 9 hours per week, 52 weeks per year until such time as T█████ F██████ is achieving at the level at which she would have been achieving but for the denial of FAPE. Tutoring may include academic tutoring, speech language therapy and/or intensive language programming as recommended by parent's experts. Tutoring shall be paid for at market rates not exceeding $200 per hour. Tutors shall be chosen by parent. For purposes of determining whether T██████ is achieving at levels she would have been at but for the denial of FAPE achievement levels shall be ascertained by formal testing paid for by DCPS as set forth in the following paragraph.

2) DCPS shall pay for annual evaluations of T█████ progress conducted by Dr. Meredith Branson or such other evaluator or evaluators chosen by parent with the first evaluation(s) to be in April 2006. Evaluations shall continue until the educational deficit is eliminated. Payment for evaluations shall be at market rates.

3) Not later than 10 calendar days following the date of this Order DCPS shall provide for the hearing file and to parent's counsel a letter specifying the procedure to be followed by tutors and other vendors to obtain payment. If this procedure requires any forms to be filled out copies of each form shall be supplied with the letter. This procedure shall provide that payments to vendors be made not later than 15 calendar days following receipt by DCPS of the vendor's invoice, notwithstanding any other procedure that may apply in other cases. In the event that DCPS fails to specify a procedure parent's counsel shall designate a procedure to DCPS with a copy to the Hearing Officer.

4) In the event of any violation of the Hearing Officer's order in this matter parent shall be entitled to a hearing within 10 days of her or counsel's written request.

Respectfully submitted,

Robert I. Berlow
Attorney for parent
301-912-2281
301-912-2282 (fax)

Dated: _____

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing memorandum and exhibits 23 and 24 was faxed to the DCPS Office of General Counsel, this 16th day of December, 2005.

In re T██████ F█████
Memorandum in Support of Compensatory Education
Page 11 of 12

204

_____

Robert I. Berlow

In re Ti███y F██████
Memorandum in Support of Compensatory Education
Page 12 of 12

205

**IN THE DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**STUDENT HEARING OFFICE**

In re T████ F██████

### DECLARATION OF MEREDITH P. BRANSON

I, Meredith Branson, depose and state as follows:

1. I am a psychologist licensed to practice in the District of Columbia and Maryland. I am currently in full-time private practice in Bethesda, Maryland. My areas of expertise are child/adolescent assessments and therapy. About 70% of my time is spent doing psycho-educational and neuropsychological evaluations and about 30%  of the time I engage in child/adolescent and family therapy.

2. I have a B.A. degree from Mount Holyoke College and an M.S. degree in Special Education (Deaf Education) from New York University.

3. I was employed as a special education teacher in New York state from 1976 to 1978, where I taught hearing impaired students with multiple disabilities. Classes were taught in sign language.

4. When I moved to the DC area in 1979, I was employed as the  Director of the School at the National Children's Center (NCC) in Northwest Washington. NCC is a private, nonprofit institution which provides daytime educational services and residential services for children with disabilities, many of whom have been diagnosed with mental retardation.

5. In 1994, I received my Ph.D. in School Psychology from the University of Maryland. Thereafter I completed a one year clinical internship as well as a year postdoctoral fellowship at the Georgetown University Child Development Center.

6. I was appointed to the Georgetown Department of Pediatrics faculty in 1997 where I worked (full-time and later part-time) until January 1, 2005). In 2004-2005, I also served as an adjunct faculty member of the Psychology Department at Howard University. I am a member of the American Psychological Association and licensed in Maryland and the District of Columbia.

7. I have testified as an expert witness in special education cases many times, both as a psychologist, and also during my tenure as Educational Director at NCC.

8. I evaluated T████ F██████ on two separate occasions in April, 2005. A report on my

206

evaluation was prepared on April 4, 2005 and is a part of the record in this case. I also reviewed all of the reports/documents that were provided to me. This included two previous psychological evaluations; one was done in 2004 by DCPS (Terrance Beason, M.Ed ) and one was done by Dr. Neil Schiff in 2005, under the auspices of the Rehabilitation Services Administration and the two IEPs developed by DCPS for the school years 2003-2004 and 2004-2005. Results of those psychological evaluations indicated that T██████ met criteria for a diagnosis of mental retardation.

9. Based upon my assessment and review of the records, I diagnosed T█████ as a child with significant learning disabilities and an attention deficit/hyperactivity disorder (ADHD). Her learning disabilities are in the areas of language processing (both expressive and receptive language), memory, and executive functions.

10. As part of my assessment, a diagnosis of mental retardation was considered, but it was rejected. It was rejected based upon the scores T██████ earned on several measures of intellectual functioning. Intelligence testing yields information about different types of thinking skills. The major instruments used for measuring the intelligence of children yield information about verbal reasoning/comprehension, nonverbal reasoning abilities, working memory, spatial reasoning, and motor processing speed. On measures of intelligence, such as the Wechsler Scales, there are no requirements for reading, math, or written language. The purpose is to try, as much as possible, to separate innate thinking/problem solving potential from learned or "school learning," which is measured on specific kinds of achievement batteries.

11. Verbal intelligence draws upon a child's accumulated learning and usually requires verbal responses to orally presented questions. Nonverbal intelligence reflects a child's more immediate problem solving skills. Test items are usually presented with visual stimuli and a child's solution to the items requires motor responses (e.g., pointing to correct pictured responses, manipulating blocks, completing matrices, carrying out paper-and-pencil tests of processing speed, etc.).

12. Scores from all of the tests are used to arrive at an overall (Full Scale) IQ score. If a child's skills are evenly developed across these domains, the Full Scale IQ can be considered an accurate reflection of overall cognitive functioning. However, when there are found to be significant discrepancies across these domains (meaning some scores in the deficient range and others that are within the broad range of normal limits), this is an unusual occurrence. Psychologists are then trained to consider this to be a "red flag" for possible learning disabilities and, in some cases, even organic impairments. It is then incumbent upon the examiner to perform additional testing to identify a child's specific profile of strengths and weaknesses.

13. In the case of T██████ F██████, her assessments, conducted by DCPS and Dr. Neil Schiff, did reveal verbal abilities that were weaker than her nonverbal (Performance) abilities. Verbal abilities were measured in the deficient range; her composite scores on nonverbal (Performance) scales were higher, in the borderline range. Therefore, there were hints that she had the potential for intellectual functioning that was not being adequately demonstrated on "traditional"

Declaration of Meredith Branson
Page 2 of 8

207

instruments that were used (Wechsler Intelligence Scales for Children and its abbreviated form, used by Mr. Beason for DCPS).

14. In a case like T████████, when verbal abilities are significantly less developed than nonverbal skills, it is necessary that an instrument be used that does NOT rely upon orally presented (verbal) instructions/directions or oral responses from the child. My evaluation of T███████ included several instruments which were specifically chosen to examine T███████ nonverbal thinking and problem solving skills (e.g., CTONI, subtests from the Woodcock-Johnson III Tests of Cognitive Abilities, Beery Developmental Test of Visual-Motor Integration).

15. The CTONI is an individually administered test of intelligence that measures problem solving, reasoning and abstract thinking abilities . For each of these domains, there were two subtests administered; one of them used pictured material and the other used geometric shapes/figures. On the Analogies domain, she was required to determine the relationship between two pictures/geometric patterns and apply this "rule" to a new picture. On the Categories domain, she had to figure out the relationship between pictured objects/geometric objects and, on the Sequences domain, T██████ was asked to choose what picture/design would be the next one in a series.

16. On the CTONI, T██████ obtained a Nonverbal Intelligence Quotient of 86, which falls within the low average range. Furthermore, on 5 of the 6 subtests which make up the CTONI, T██████ earned scores within the average range of intelligence. On the Spatial Relations test from the WJ-COG battery, which assesses visual-spatial thinking, T███████ score (103) fell solidly within the average range.

17. Results from the spatial relations subtest from the WJ cognitive batter and Developmental Test of Visual Motor Integration (VMI) substantiated the finding of the C-TONI.

18. These results provided clear evidence of the unevenness of T███████ performance, i.e., her substantial below average verbal abilities as compared to her low average non-verbal intelligence. This means that her intelligence cannot be adequately reflected by one full scale I IQ score but needs to be interpreted based upon her verbal vs. performance abilities. This is a typical pattern for children with specific learning disabilities and showed clearly that T██████ was functioning at a greater potential than would be surmised from the DCPS findings.

19. Evaluations conducted by DCPS did not include ANY specific instruments to measure nonverbal intelligence. This should have been done, especially given the fact that T██████ demonstrated a relative strength on the Performance (nonverbal) component of the abbreviated intelligence battery (WASI), which was used by Mr. Beason in April, 2004. At that time, T██████ Performance IQ (75) was significantly stronger than her far below average score (57) on the Verbal domain, indicating the likelihood of strengths in the nonverbal domain.

20. As a result of the inadequacy of the DCPS evaluation, it cannot be considered a full and complete assessment of T██████ intellectual functioning. The inadequacy of the DCPS

evaluation resulted in an inaccurate diagnosis . The inaccurate diagnosis resulted in an inappropriate placement with inadequate services for T█████.  By its failure to utilize instruments that could best identify T███████ strengths, its findings were used to conclude that T█████ met criteria for a diagnosis of mental retardation. Had she been correctly identified as a student with specific learning disabilities, it would be hoped that her IEP would then have called for specific (and intense) levels of speech-language services, a specific treatment program to target her failure to make gains in reading skills,  and she might have been placed in a classroom setting designed to educate children with similar disabilities,  .

21.  T█████ has also been administered several achievement tests since October 2002.  Across all of the reading measures that have been administered to her since October of 2002, T███████ basic reading skills (e.g., word decoding, sight word recognition) have remained virtually the same. In April, 2005, when I assessed her achievement skills, she was performing at a K:8 level on a test of Word Reading (which includes letter word ID and sight word recognition) and at a 1:1 level on Reading Comprehension. This was the Wechsler Individual Achievement Test. Even though she was then in the 3rd grade (and should have been in the 4th grade but was retained her kindergarten year).  This compares with a word reading score of K:1 in October 2002 (as reflected in DCPS MDT meeting notes) and a reading comprehension socre of 1:0 in October 2002.

22.  It is important to comment upon what "demands" are placed on a child on the entry level items of reading measures. On the Word Reading subtest, T███████ score was achieved by only being able to name several letters of the alphabet. On the Reading Comprehension test, entry-level items have picture cues and T█████ was able to use those cues to make a good guess. She was not able to read ANY of the phrases/sentences without pictures. She was, for all intents and purposes, deemed to be a "non-reader."

23.  Given the results of the October 2002 DCPS testing T███████ reading goals/objectives should have been to provide her with specific pre-reading skills, using a research-based phonological awareness training program.  By research based I mean based on studies of the brain related to reading.  By phonological awareness training program I mean breaking the reading process down into its smallest components beginning with the recognition of sounds, being able to break words into component sounds, mastering letter sound patterns, learning basic rules of pronunciation for those patters and eventually using those rules to decode or "read" individual words.  A research-based program teaches these skills systemcatically and explicitly. The National Reading Panel, which was created by Congress in 1997 to review all of the existing research related to reading to find evidence of what works in teaching children to read, found that children who are taught phonics systematicically and explicitly make greater progress in reading than those taught with any other type of instruction. T█████ should have had this type of reading instruction in a full-time, self-contained, language-based educational program in a classroom with a student:teacher ratio no greater than 5:1. In addition, T█████ needed to have both individual and group language therapy to address her weaknesses in oral expression and listening comprehension.

Declaration of Meredith Branson<br>Page 4 of 8

24. By language-based I mean a classroom in which an emphasis is placed upon all areas of language development (e.g., listening, speaking, attending, social skills) throughout the entire day. For example, even when the content area being taught is math, the teacher is aware of the need to break orally presented directions down into smaller steps, use visual strategies to enhance comprehension, teach specific vocabulary, and allow demonstration of skills through formats other than words/

25. The reason a language-based program was needed for T██████ was her primary diagnosis is that of a student with a significant language based learning disability. It is this disability that makes it impossible for T█████ to learn language like typically developing young readers and requires language based instruction.

26. Had an appropriate IEP been developed and fully implemented, it is likely that:

        a. T█████ would have demonstrated sight/word recognition and word decoding skills at a approximately an ending first grade or beginning 2nd grade level by April 2005 when I tested her;

        b. T█████ would have made significant gains in her ability to attend to and comprehend multiple-step directions;

        c. T██████ attention span and memory skills would have been stronger a result of frequent and appropriate repetition of newly learned material presented in a systematic manner;

        d. T██████ ability to interact successfully with peers would have been improved as a result of social skills training and placement with peers of comparable intellectual functioning.

27. None of these goals/objectives were attained because T██████ IEPs were not based on an individualized assessment of her phonetic strengths and weaknesses. In fact the same goals/objectives were repeated year to year, a fact that shows that no educational benefit was obtained. Therefore, in April 2005 her levels of performance were identical to her levels as measured in October 2002, 30 months earlier.

28. A child with T██████ profile can be expected to make six months progress every twelve months of classroom learning if provided an appropriate full time special education program including extended school year services. Therefore, in 30 months, T█████ should have made 12 to 15 months progress, depending on how many months she was actually in school. And that is only up to the point I tested her. T█████ continued to lose ground after that testing because she was in an improper placement until she started school at Accotink in Juy 2005, 33 months after she was originally tested by DCPS.

Declaration of Meredith Branson<br>
Page 5 of 8

29. Had T▮▮▮▮made this progress she would still need full time special education because she would still have the learning disability, that does not go away, but she would be proceeding from a higher level, that is, a level approximately 15 months ahead of where she was when I tested her.

30. As noted above, a child like T▮▮▮▮ can be expected to make 6 months worth of progress in every calendar year if in school during the whole calendar year.  Therefore, to make up a  deficit caused by a 33 month denial of appropriate education, when with an appropriate education she would have made at least 16 to 17 months of progress in 33 months, T▮▮▮▮ needs the equivalent of at least 33 months of full time special education and related services to close the gap.

31.  In the area of math reasoning, T▮▮▮▮ she demonstrated only 3 months progress from October 25, 2002 to April 30, 2005.  Her performance in October 2002 was at a K:4 level and in April 2005, measured at a K:3 level, that is, T▮▮▮ made no progress.  Had T▮▮▮ been properly diagnosed and properly programmed , over this same time period, it is likely that her scores would have been at least at the emerging 2nd grade level.

 32.  On a Spelling test, she demonstrated a gain of 2 months gains over a 15 month time period, that is, no signfificant progress was made. Again, had she been properly identified and served, I would have expected her Spelling skills to have improved to the  beginning 2nd grade level.  M – logically I would think this goes above with reading]

33.  In addition, T▮▮▮▮ behavioral difficulties became more problematic as a result of her placement in classrooms in which she could not keep up with peers. Information provided by school staff at her IEP meetings, as reflected in IEP/MDT meeting notes, revealed increasing concerns about her noncompliance and disruptive behaviors in the classroom. There was no attempt to assess her attentional skills or to make recommendations to her mother to seek outsides evaluations of T▮▮▮▮▮ attentional problems.

34.  Most importantly, none of the IEPs put forth by DCPS included any specific behavioral goals or objectives to address T▮▮▮▮ distractibility, impulsivity, and short attention span. T▮▮▮ needed, and was not given, a specific behavior management program which would have identified specific problematic behaviors, specified appropriate alternative behaviors and rewarded her for demonstrating those behaviors on a regular basis.   Had these things been done I would have expected T▮▮▮▮ behaviors to have been brought under control.  Also her social skills would most likely have improved closer to her chronological age.  Once under control T▮▮▮ would have been more available for learning.

35.  T▮▮▮▮ IEPs did not call for any individual or group counseling nor were there any behavioral goals written to target T▮▮▮▮ social-emotional issues. Instead, due to her significant speech-language problems and immature social skills, she became a target of school bullies and her self-esteem was further eroded.

36.  Had T▮▮▮ had an appropriate Individual Education Plan, beginning at least in the year

2003, it is my opinion that she would not have been as far behind as she was when I tested her in April 2005. Had she been properly identified by DCPS, placed in an appropriate self-contained special education classroom with appropriate goals and objectives, and received the therapeutic services that she required, it is likely that, today, T███ would be functioning at a much higher level, most likely at a mid-2nd grade level in terms of her academic and social-emotional functioning. .

37. Because she slipped farther and farther behind, it is very likely to take her longer to catch up than it would have taken to acquire the same skills at a younger age. As Dr. Sally Shaywitz, a leading neuroscientist at the Yale Center for the Study of Learning and Attention comments in her book, Overcoming Dyslexia:

> "There is no question that early intervention and treatment bring about more positive change at a faster pace than an intervention provided to an older child ."

38. T███ problems will not go away, but they can still be remediated. She will continue to experience language processing problems and attentional difficulties throughout her lifetime. However, with appropriate programs and teachers she can be expected to learn and make progress in academics and in her acquisition of life skills.

39. However, T███ learns differently. She will obtain skills at a slower rate than typical peers. She requires more frequent review of newly learned information and a more intense level of services (e.g., being taught in smaller classes, in a special education setting, with specialized methods/technologies, and therapies integrated into her school-day).

40. When a child falls behind, as T███ has, she will require very intensive interventions to bring her back up to adequate levels because of the large amount of practice and learning that she lost every day for more than two years.

41. Given the intensity of services T███ is now getting at Accotink Academy, it can be expected that she should increase her academic skill levels at a rate of approximately 6 months per calendar year **if the current IEP is fully executed and if full time special education and extended school year services are continued for the foreseeable future**. It must be emphasized however that T███ needs this intense program to progress from where she is. This program will not fill the gap created by the past denial of an appropriate education.

42. Because of DCPS' failure to provide T███ with an appropriate educational program, she will require compensatory educational services. Compensatory education should be provided for T███ in the form of massive amounts of individualized academic tutoring and possibly additional speech language therapy. Individualized services are needed because of T███ attention problems and to allow the teacher/therapist to focus intensively on areas of immediate need as they are identified by T███ school-based teachers and therapists. Research has clearly shown that the more intensive the education the quicker children with disabilities like T███ are able to learn. By massive, I mean as many hours as can be "squeezed into" her

daily routine (after school hours and on weekends) throughout the calendar year. This needs to be done in order to help her to make up the gap between where she was when I tested her, at approximately the kindergarten level, and where it is likely she would have been, at the early to mid second grade level if properly programmed since January 2003, and to avoid any regression that might occur during school holidays, vacations, etc.

43.  This tutoring needs to be provided until T██████, is able to demonstrate through formal testing (the Wechsler Individual Achievement Test so that comparisons can be made) that the "gap" created by the lack of appropriate services provided to her by DCPS, is no longer evident on standardized testing.   I believe it is likely that if T██████ receives tutoring by a qualified tutor and any needed speech language therapy, as a supplement to her Accotink program, she will be able to close the gap by the time she turns 18 if not sooner.    However, if she fails to fill the gap by then tutoring should continue and its focus shift if appropriate to pre-vocational training.


        I, Meredith Branson state, under penalties of perjury that the foregoing is true to the best of my knowledge and belief.


_____     _____
Meredith Branson                               Date

213

**SCI EDUCATIONAL CONSULTANTS, INC.**
8800 Quiet Stream Court
Potomac, Maryland 20854
(301) 983-4124/(301) 983-2509 Fax

DECLARATION OF DR. SHEILA C. ISEMAN
CONCERNING T██████ F█████████

I, Dr. Sheila C. Iseman, am a citizen of the United States of America. I am over 18 years
of age. I declare that:

1. I am an educational consultant. My clients include students of the District of
Columbia Public Schools with special needs and their parents/guardians. I have been
President and sole employee of SCI Educational Consultants, Inc. (SCI) since 1994.
SCI's address is 8800 Quiet Stream Court, Potomac, Maryland 20854. I have a B.A. in
Education, a M.S. in Special Education and a PhD. in Human Development. I have
worked with students with special needs for over 35 years. My experience includes
teaching, administration and consulting to students, families and organizations, including
the State Department of Education. I was appointed by Judge Waddy as a 94-142 hearing
officer, presiding over special education cases in the District of Columbia. I was also a
hearing officer in Maryland on the state level and in local jurisdictions under the
Individuals with Disabilities Education Act (IDEA).

2. As an educational consultant, I assist families in understanding and obtaining
appropriate programming and placement for their children. My activities include, but are
not limited to, consulting with parents and professionals, observing students in their
schools, consulting with school staff, attending various school meetings in regard to
students with special needs, making referrals for assessments necessary to evaluate
suspected disabilities, school exploration, and testifying, when necessary, at
administrative special education due process and judicial hearings.

3. On 14 October 2004 I was contacted by Ms Angelique Moore, parent and guardian of
T███ F██████. She expressed concern that her then nine year old daughter was not
making sufficient educational progress due to inappropriate and inadequate placement
and programming at school. I agreed to observe T████ at Stanton Elementary School
and discuss my findings with her mother. I initially reviewed documents relevant to this
student and have since reviewed all documents disclosed by both parties in this case.

4. I was able to observe T████ F██████ and discuss her program and progress with
school staff on three occasions, 3 November 2004, 8 December 2004 and 22 April 2005.
I was able to observe T████ in her regular education class as well as in special
education.

5. Observation of T████ in her regular education class revealed a student who was off-
task most of the time, inattentive and disruptive. T██████ regular 3rd grade teacher
stated that she was unable to do any of the work that her other 18 students were able to
accomplish. The teacher was not given alternative, individualized work for T████ by

*TF 24*

214

Page 2

the special education teacher. This left her with no appropriate classwork to do. In addition, the 3rd grade teacher stated that T██████ was unable to recognize all letters of the alphabet, including those that comprised her first name. When she did write letters her visual memory was so severe that she could not remember their configuration and reproduced them copying stroke by stroke. She was not able to add numbers beyond single-digit addition without regrouping. T██████, according to her regular education teacher, became understandably frustrated, bothering the other students in the class by relying on them in an attempt to complete any tasks she was given. When very frustrated, she would become very emotional and had, at times, become physically aggressive. The teacher described her as often out of control. In response, according to the 3rd grade teacher, T██████ was ostracized by her peers and often teased, promoting a cycle of reciprocal inappropriate behavior.

6. Observation of T██████ in special education took place in the back of another 3rd grade class. The special education teacher did not have a room of her own and was assigned so many students in different classes that she moved her students from class to class and room to room, seeking places in which she could deliver service. T██████ sat with the special education teacher and three other students. She was observed to be trying hard to decode words, but was meeting with extreme frustration. After a while, she became less cooperative, refusing to work.

7. Consultation with her special education teacher occurred at the beginning of the observation. As soon as she realized that I was at school to see T██████, she approached me saying "T██████ not right for this. She needs another setting. Get her out of here to somewhere she can receive help." This unusual plea promoted a discussion in which the teacher elaborated, explaining that T██████ appeared to be a bright enough student who was not reading at all, was unable to write letters without a model and was "picked on by the other students until she cried". She explained that Stanton's model of special education was inclusion-based. The special education teacher was supposed to serve students in their regular education classes. This became impossible due to the large caseload of students she was assigned who were enrolled in a number of different homerooms. This special education teacher felt that T██████ educational issues were too severe for Stanton's model. She stated that T██████ needed a self-contained class all day with only a few students and the expertise of a special education staff.

8. T██████ was tested in October 2002 and she did not become eligible to receive special education until January of 2003 when she was in 1st grade. At that point she was found eligible as a student with learning disabilities.

9. In June of 2004, T██████ was reclassified as a student with mental retardation, based upon a language-based cognitive evaluation by DCPS. The evaluation by Terrance Beason did not refer to past evaluations or demonstrate recognition of T██████ severe speech and language deficits, making this evaluation incomplete. Based upon her IEP and classification as mentally retarded, T██████ was placed in an inappropriate inclusion

215

Page 3

program at Stanton (described above). Since T█████ had achieved a low score on Dr. Beason's language-based IQ test, her achievement scores did not appear as discrepant or severe as compared to her intellectual potential. Given T█████ profile, a language-based test alone was not appropriate by itself. T█████ should have been given a non-language based test, such as the C-TONI (Comprehensive Test of Nonverbal Intelligence) to determine her true potential. Had that been done in 2004 as it was in 2005, a discrepancy between her potential and academic achievement would have been apparent. Therefore, T█████ was provided with a program, based on incomplete and erroneous information, which later proved to be inadequate.

10. In April of 2005, T█████ was evaluated by Dr. Meredith Branson. This time her language deficits were recognized and a non-verbal intelligence test was administered. T█████ scored in the low average range of intelligence. Discrepancies between her intellectual performance and academic achievement could readily be seen. Dr. Branson accurately recognized her as having "significant language-based learning disabilities", rather than mental retardation.

11. Since T█████ initial evaluations, conducted to determine eligibility for special education, several assessments have been completed. Existing records have revealed two evaluation reports, dated 30 April 2004 and 4 April 2005. Prior evaluations, 25 October 2002 are documented on IEPs. Analysis of these scores shows that T█████ had failed to make any progress in 2.5 years. During this 2.5 year period T█████ attended three different schools as placed by DCPS. Initially determined to be learning disabled, she was later determined to be mentally retarded. All programs provided part time special education, minimal speech and language services and no occupational therapy. While the scores above reflect significant deficits it must be understood that T█████ actually had repeated kindergarten. Considering her additional year of exposure to academics and advanced age, these scores are now understood to reflect even much greater deficits.

12. As the result of an administrative hearing conducted 11 May 2005, T█████ was placed at Accotink Academy where she has been receiving services as a student with learning disabilities in a full day special education program. She attended extended school year during the summer of 2005 and has been in attendance this 2005-2006 school year. T█████ is one of five students with a special education teacher, a co-teacher and an instructional assistant dedicated to another classmate. This low student:teacher ratio is providing an appropriate program for T█████ and is consistent with the type of program I described as necessary to meet her needs at the 11 May 2005 hearing.

13. Recently, I reviewed T█████ progress to date at Accotink Academy. I was interested in determining:
-what progress, if any, T█████ has made in this more intensive environment.
-what interventions she required to assist in closing the gap between where she is performing academically and where she could have been performing had DCPS provided

Page 4

her with appropriate programming since determining that she was eligible for special
education.
I have discussed T█████ with her special education teacher and reviewed progress reports
and the current IEP developed by Accotink Academy.

14.  T█████ receives individual and group counseling at Accotink Academy to address
interpersonal skills.  T█████ has participated in counseling in a productive way.  When
off-task, she has been able to be redirected easily.  Strategies learned in therapy have
been applied by T█████ in the classroom.  She works well with peers and is no longer
displaying physical or verbal aggression or significant frustration.  When she has enjoyed
a particular success she has stated that her mother would be proud of her.  She has yet,
however, taken ownership of these successes and has not credited herself with successful
efforts.

15.  In speech and language therapy, T█████ is reported to have made "average to
excellent progress".  At Accotink Academy the speech and language pathologist works
on receptive and expressive language as well as on reading, using the Orton-Gillingham
approach.  T█████ is working hard in speech and language, especially in reading.  This is
in contrast to her performance at Stanton ES where she was seen to initially try and then
"give up".

16.  In occupational therapy T█████ is working on sensory and perceptual processing.
These areas also affect reading.  She is learning to persevere through challenging tasks.
T█████ was never evaluated for or receive occupational therapy through DCPS.

17.  In the classroom, T█████ has made excellent progress in the area of academics.  In
reading, T█████ now reads approximately 100 words by sight and through the use of
phonics.  She is reading word families and concentrating on short vowels and double
consonant endings.  She persists through reading tasks.  The speech and language
pathologist works in her classroom twice a week assisting the students with reading.  In
math, as compared to Stanton ES where she was adding single digits without regrouping,
T█████ is now adding three digit numbers with regrouping.  This is the first real progress
that T█████ has made since October 2002.  While she remains significantly behind where
she should be, given her profile, this initial progress is hopeful.  It also indicates that she
could have made progress given an appropriate program starting in 2003.

18.  Now that T█████ has proven that she is able to make appropriate progress, the
question must be asked "What factors comprised inappropriate programming?"
preventing learning in the past.  Both the 2004-2005 program at Stanton ES and the 14
June 2004 IEP were found to be inappropriate and inadequate at the administrative
hearing.  Attention must now be turned to the 2002-2003 school year and the 2003-2004
school year.

Page 5

19. It is noted that just one month after T████y started first grade, in October 2002, she was tested. Her skills were found to be sufficiently deficit for eligibility in special education by January of 2003.

20. The foundation, of any program for a student who is eligible for special education, is the IEP. The 27 January 2003 IEP was inadequate to support T██████e needs.
-Sensory and perceptual processing deficits are developmental, yet T████ was never evaluated for occupational therapy. The psychoeducational did report testing in the visual-motor integration area which showed clear deficits (VMI=55). The 27 January 2003 IEP did not include any occupational therapy goals and objectives or therapy.
-T█████ score on the 25 October 2002 WIAT in written expression showed deficits as severe as her reading and math areas, yet no goals and objectives or special education service hours addressed these needs.
-Reading goals and objectives do not reflect a sensible, sequential plan for acquiring skills for decoding and comprehension. Without a comprehensive plan, the foundational skills for acquisition of phonics and comprehension could not be acquired. This IEP then provided an inadequate plan for remediation. The objectives also provide insufficient expectations for progress. An example is "Student will learn five sight words from the Dolch preprimer list." The period of plan for an IEP is one year, yet T████is only expected to gain five sight words in an entire year. If properly programmed, T████ would have been expected to gain at least 100 sight words and been well on the way toward establishing the foundational skills for reading.
-Math goals and objectives are also inadequate. They plan for insufficient progress. If T████ mastered all math goals and objectives as planned on the 27 January 2003 IEP, she would perform no higher than originally tested. Most of the goals and objectives are on the kindergarten curriculum level. If properly programmed, she would have been expected to make at least an additional six month's progress, or perform at a mid-first grade level.
-T█████ language needs are extensive and were at the time of her initial IEP. Language is developmental in nature and deficits are present at an early age. Speech and language testing on 9 December 2002 indicated a total language quotient of 69. This severe deficit demanded intensive remediation, yet the IEP contains only two speech and language objectives, neither of which provides the basis for sufficient treatment. There are no objectives that address receptive language, the ability to understand language. There are no objectives that address organization of language. These two areas are cited within the IEP as areas of need, but not addressed with remediation. Lastly, the ½ hour a week prescribed by the IEP in speech and language represents inadequate service hours for a student whose needs are so severe. The notes from the 16 January 2004 IEP that followed state "T█████ progress in language therapy has been minimal...". Insufficient services produced insufficient success.
-No goals and objectives were included on the IEP to address needs in the area of executive functioning. In other words, there was no plan to address T█████ needs in organization, attention, impulsivity, distractibility and task completion. Dr. Neil Schiff tested T█████ in January of 2005. Testing revealed Attention Deficit Disorder,

218

Page 6

Predominantly Inattentive Type. This should have been evaluated and addressed years earlier. The April 2004 testing by Terrance Beason also noted that T███████ "concentration and motivation waivered", but executive functioning skills were not tested. Since ADHD is developmental in nature, these deficits existed prior to both Beason's and Schiff's evaluations. Attentional problems are neither unusual or unexpected in students with learning disabilities. These deficits should have been explored and programmed for in the 27 January 2003 IEP.

-Goals and objectives must be measurable. None of the goals and objectives contain criteria for measurement of progress. They are, in general, either vague or absent of criteria.

-T█████, although in need, was not provided with extended school year services. At the least, given T█████ lack of progress and history of retention, a meeting should have been convened to determine if T█████ met the criteria as a student who required extended school year services.

21. The January 2004 IEP was no better or substantially different than the January 2003 IEP. It added no additional special education services. It added only ½ hour increase in speech and language services. When students who do not master their IEP goals, and the goals are repeated, it is the most obvious indication that special education services must be intensified.

-With the exception of the communication goals and objectives, all goals and objectives duplicated the ones from the 27 January 2003 IEP. While T█████ lack of progress during the period of plan from 27 January 2003 to 16 January 2004 is testified to by the duplicated objectives, no increase in special education hours is provided on the IEP. Thus, T█████ remained in an inappropriate program with an inappropriate IEP at its foundation. If properly programmed, T█████ would have made at least an additional six months' progress.

-The communication or speech and language therapy goals and objectives did change, however, the additional goals and objectives did not address receptive language or the organization of language. In fact, they were in the area of phonemic awareness, related to reading decoding. While reading was a significant concern, all of T█████ major areas of language deficit continued to be unremediated due to a lack of goals and objectives in the areas of receptive and expressive language . Lack of success is testified to by a 3 June 2004 Vineland score of 42, showing a student totally unprepared to interact with others using language.

22. Students with learning disability typically progress at a slower pace than their typical peers. Given the nature of T█████ disability and her nonverbal strengths, she still should have made progress if given an appropriate program during the 2002-2003 and 2003-2004 school year. While it is unlikely that she would have made a year's progress in a year's time, it is reasonable to expect that with the appropriate intervention she would have made at least half the progress of her typically developing peers. Instead of making two years' progress in two years, T█████ made no progress. Using this formula of half the progress of a typical peer, T█████ should have been performing academically

Page 7

on the early second grade level by the end of the 2003-2004 school year if she had appropriate intervention.

23. There is a readiness time for all learning. T██████ is well-past the point at which she could have learned the expected academic, language and social skills with the least effort. Remediation at this point will be much more difficult, although necessary. It will take intensive intervention, delivered without interruption, to achieve significant progress to close the gap between what she could have learned given appropriate instruction during the 2002-2003 and 2003-2004 school years and what she did learn, which represented essentially no progress. It will now take longer to achieve gains and will require individual instruction. The demands on T██████ will be greater than those placed on a typically developing peer, but served well in a consistent manner, she should begin to close the gap.

24. Services necessary to bridge this gap should be delivered through compensatory education. It is only with education above and beyond the typical school day that T██████ will make up for lost time. Individual tutoring must be provided whenever possible after school and weekends during the school year. Given that T██████ will continue to qualify for extended school year, as it appears that she will given her learning profile, she will still have the month of August each year for individual tutoring. During August, each year, T██████ should receive tutoring as many hours as she can derive benefit from, beginning with four hours per day. T██████ did not benefit from her part-time special education program during the 2002-2003 and 2003-2004 school years. Testing validated this point. Tutoring should be provided through compensatory education for at least five of the six hours per day she was in school. One hour for lunch is omitted from calculation. At this rate, in two year, T██████ missed 1,800 hours of instruction. Noting that it will take her longer to close the gap between what she should have learned and what she did learn, she must be provided with at least this number of hours of tutoring to be used each year until they are exhausted. If 1,800 hours of tutoring are exhausted and standardized testing reveals that she has not yet closed the gap, tutoring should continue.

25. Due to lack of instruction and a significant learning disability, T██████ may require the support of a job coach during the transition phase of her education. IDEA provides for transition training in order to prepare for community participation, including work, after graduation from school. Any remaining compensatory education hours should be dedicated to transition in the form of a job coach as necessary. Most often students with learning disabilities as severe as T██████ require job coaching during transition in order to apply their acquired skills to the world of work.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Page 8

15 December 2005

_S. Sheila C. Iseman_
Dr. Sheila C. Iseman